UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

UNITED STATES OF AMERICA

V.                                          CRIMINAL NO. 3:14-CR-11-DPJ-LRA

DANIEL ROBERT

ORDER

After a three-day jury trial in January 2020, Defendant Daniel Robert was convicted of

all four drug-trafficking charges against him.  He now seeks a judgment of acquittal

notwithstanding the verdict [207] and a new trial [209].  For the following reasons, both motions

are denied.

I.      Facts and Procedural History

The Grand Jury charged Robert in a four-count indictment related to events that took

place in 2007 and 2009.  Regarding 2007, he was charged with conspiring to possess with intent

to distribute 500 grams or more of cocaine hydrochloride (Count 1) and with possession with

intent to distribute 500 grams or more of cocaine hydrochloride (Count 2).  The counts related to

2009 charged Robert with conspiring to possess with intent to distribute five kilograms or more

of cocaine hydrochloride (Count 3) and with attempting to possess with intent to distribute five

kilograms or more of cocaine hydrochloride (Count 4).  After the jury convicted Robert on all

four counts, he filed his post-trial motions for a judgment of acquittal and a new trial.  The

Government responded to both motions; Robert failed to file a reply, and the time to do so has

now passed.[1]

_____

[1] Under Local Rule 47(D), Robert's replies in support of his motions were due on February 5 and
February 19, 2020.  After those deadlines expired, Robert's trial counsel, the Honorable Leslie
C. Gates, unexpectedly passed away.

II.     Standards

Federal Rule of Criminal Procedure 29 allows the Court to set aside a jury's guilty verdict if "the evidence is insufficient to sustain a conviction."  The standard for reviewing an insufficient-evidence claim is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the evidence establishes the essential elements of the crime beyond a reasonable doubt."  *United States v. Bellew*, 369 F.3d 450, 452 (5th Cir. 2004) (quoting *Jackson v. Virginia*, 43 U.S. 307, 319 (1979)).

Rule 33 allows the Court to "vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  But "[t]he grant of a new trial is necessarily an extreme measure."  *United States v. O'Keefe*, 128 F.3d 885, 898 (5th Cir. 1997).  Therefore, "motions for new trial are not favored, and are granted only with great caution."  *Id.* (citing *United States v. Hamilton*, 559 F.2d 1370, 1373 (5th Cir. 1977)).  "A new trial is granted 'only upon demonstration of adverse effects on substantial rights of a defendant.'"  *United States v. Rasco*, 123 F.3d 222, 228 (5th Cir. 1997) (quoting *United States v. Cooks*, 52 F.3d 101, 103 (5th Cir. 1995)).  An error impacts a defendant's substantial rights if "it affected the outcome of the trial court proceedings."  *United States v. Alarcon*, 261 F.3d 416, 423 (5th Cir. 2001).

III.    Analysis

Robert takes a shotgun approach to his motions, asserting dozens of issues with little or no analysis.  For organizational purposes, the arguments will be grouped into the following subjects:  (1) the sufficiency of the evidence; (2) the Government's reliance on uncorroborated co-conspirator testimony; (3) renewed arguments; (4) Robert's jail-house telephone calls; (5) issues related to testimony about Deadrian Hubbard; and (6) the *Allen* charge.  The Court will address each area separately.

A.      Sufficiency of the Evidence

Robert argues, without elaboration, that "[t]he evidence was insufficient to sustain the verdict."  Mot. [207] ¶ 1; *see also* Mot. [209] ¶ 1 ("[T]he evidence was weak, confusing, and inconsistent, and a new trial should be granted.").  He fails to specify which elements of which charges lacked sufficient proof, and contrary to his conclusory assertions, the evidence of guilt was overwhelming.[2]

Starting with Counts 1 and 2, there is no dispute that (1) a drug-trafficking conspiracy existed in 2007 or (2) authorities obtained approximately one kilogram of cocaine in a controlled purchase from Michael McMillian and LaChristopher Russell in Lauderdale County, Mississippi. As to Robert, the jury was asked to decide whether he was associated with that conspiracy and whether he had constructive possession of the cocaine.

To begin, former Jackson Police Department officer Juan Cloy testified that in 2007 he worked on a joint task force with the Federal Bureau of Investigation aimed at drug trafficking in Mississippi.  During the task force's investigation, it established a controlled purchase of cocaine using confidential informant Deadrian Hubbard.  On February 22, 2007, Hubbard delivered $16,000 to Robert's co-defendant Michael McMillian, and on March 23, 2007, Hubbard obtained approximately one kilogram of cocaine from co-defendant LaChristopher Russell.

Robert's former co-defendants McMillian and Russell both took plea deals and confirmed his involvement in the 2007 controlled purchase.  First, McMillian testified that

---

[2]  This Order identifies those instances when Robert failed to make a contemporaneous objection at trial or failed to offer a substantive post-trial argument.  Those observations should not be misconstrued as statements on whether counsel rendered deficient performance.  While the Court does not prejudge that issue, it is apparent that the post-trial motions assert every conceivable argument, no matter how lacking in merit.  It is not, therefore, surprising that they come with little argument or authority and were not preserved as error at trial.

Robert directed him to take Hubbard's $16,000 to a Texas location where he purchased the cocaine.  McMillian also stated that the February 2007 run to Texas was not his first and that Robert had accompanied him on one of his previous trips.  When making those runs, McMillian drove a Dodge Durango that Robert provided; the truck was outfitted with a secret compartment under a back seat.  Robert told McMillian when to go to Texas, and Robert or Russell paid him $500 per run.

Russell's testimony confirmed McMillian's account of the 2007 transaction involving Hubbard.  Russell further testified that he made approximately five runs to Texas with Robert to procure drugs.  Notably, the cocaine Hubbard obtained from Russell on March 23, 2007, was packaged in the same way as the cocaine later seized in 2009:  wrapped in green cellophane. And on both occasions, the cocaine was trafficked in vehicles specially outfitted with secret compartments.  As discussed below, the evidence linking Robert to the drugs seized in 2009 is even stronger, so the similarities with the activities in 2009 further link Robert to the drug trafficking in 2007.  Thus, the evidence supporting the convictions for Counts 1 and 2 was more than sufficient.

The same is true for Counts 3 and 4.  On June 26, 2009, Officer Ray Ruggles of the Vidor Police Department in east Texas stopped a Ford F-250 that was heading east pulling a trailer with no license plate.  Robert was driving the truck, and Russell was in the passenger seat.  Russell testified that he and Robert had driven to Texas with money to buy drugs and were on their way back to Meridian, Mississippi, with those drugs when Ruggles stopped them.

Ruggles ran the tag on the truck Robert was driving and learned that it had been reported stolen.  Although Robert claimed that the truck was his fathers, the story had holes, so Ruggles arrested Robert and impounded the F-250.  When Cloy heard about the stop, he called the Vidor

Police Department to report that Robert was transporting cocaine.  And after much searching, officers discovered that the F-250's driver's seat seatback was actually a fabricated hidden compartment, wrapped in carpet, and then covered with the truck's leather seat cover.  Inside the compartment, officers found eight bundles of cocaine weighing approximately one kilogram each.

 

Exs. G-11(b), G-11(f).

Thus, Robert was literally sitting on eight kilograms of cocaine when arrested in Texas. The drugs came from the same state where McMillian and Russell said Robert obtained drugs in 2007; they were packaged in the same quantities and manner (using green cellophane) as the drugs in the 2007 controlled purchase; and they were transported in a similar hidden compartment.  All of that corroborated the co-conspirators' testimony and linked Robert to the 2007 controlled purchase.

Things then grew worse for Robert when his former girlfriend, Rantrese Smith, called the Vidor Police Department trying to purchase the still-impounded F-250.  Seeing an opportunity for another sting, officers replaced the cocaine with fake drugs and restored the hidden

compartment.  They then arranged a meeting with Smith in Jackson, Mississippi, at which Smith thought she was purchasing the truck from an insurance company for $23,500.

When the meeting occurred, Smith readily tendered $23,500 in cash without inspecting the truck or taking it for a test drive.  More significantly, Robert arrived with Smith and inspected the driver's seat seatback (*i.e.*, the hidden compartment) before the purchase.  He also looked briefly at the driver's side front wheel, but it is clear from surveillance video that Robert was singularly interested in the seatback.  And for good reason:  he thought it contained approximately eight kilograms of cocaine.



Ex. G-14(n).

After the purchase, Smith drove the F-250 to Russell's house in Lauderdale County, Mississippi.  Russell had tools to open the secret compartment, and, according to him, when

Smith and Robert arrived with the truck, Robert asked him, "You ready to work?"  A joint task force then swooped in and arrested Smith and Russell.[3]

Finally, law-enforcement officers taped numerous jail-house telephone calls between Robert and unidentified free-world callers.  In several of the calls, Robert instructed the callers to tell others, including McMillian and Russell, to change their statements and take full responsibility for the charges.  *See* Exs. G-18, G-19(a)–G-19(g).  He also told the callers to encourage potential witnesses to evade the Government's efforts to serve their trial subpoenas.  *Id.*  This evidence demonstrates a consciousness of guilt that further supports the jury's verdict.  In sum, the evidence was more than sufficient to support the convictions on all four counts.

B.      Co-Conspirator Testimony

Robert contends that "[t]he uncorroborated testimony of alleged co-conspirators was accepted by the jury even though substantially impeached."  Mot. [207] ¶ 4 (citing *United States v. Zambrana*, 841 F.2d 1320 (7th Cir. 1988)).  He also argues the co-conspirators' testimony "should not even have been submitted to the jury because of the unreliability of the co-conspirators' statement[s]."  *Id.* ¶ 5.

Aside from the fact that Robert failed to raise those objections at trial, he never links the arguments to a specific co-conspirator, three of whom testified against him—McMillian, Russell, and Smith.  Nor does he explain why their statements are unreliable, how they were impeached, why he considers them uncorroborated, or how any of that would justify excluding the witnesses outright.  And as detailed above, their testimony was corroborated by each other's testimony as

_____

[3] For context, the Court learned during the suppression hearing that Robert was not arrested that day or in the years to follow because he moved to Illinois where he lived under a fake name and social-security number.  They jury did not, however, learn those facts.

well as other evidence of Robert's guilt, including his presence when the drugs were recovered in Texas and at the subsequent sting operation in Jackson, Mississippi.

But even assuming the evidence was uncorroborated, "a defendant may be convicted on the uncorroborated testimony of a coconspirator who has accepted a plea bargain unless the coconspirator's testimony is incredible." *United States v. Valdez*, 453 F.3d 252, 257 (5th Cir. 2006) (citation omitted). "Testimony is incredible as a matter of law only if it relates to facts that the witness could not possibly have observed or to events which could not have occurred under the laws of nature." *United States v. Bermea*, 30 F.3d 1539, 1552 (5th Cir. 1994). None of the co-conspirators offered incredible testimony.

Finally, the Court properly instructed the jury regarding co-conspirator testimony. Before McMillian testified, the Court told the jury, *sua sponte*, that McMillian had also been "charged in this indictment [and] entered a plea of guilt" and instructed the jury "that just because one defendant pleads guilty, that doesn't mean that the defendant on trial is guilty. You can't take Mr. McMillian's plea of guilt and transfer that onto Mr. Robert." Jan. 21, 2020 Tr. at 104. The Court again addressed the issue in its final instructions:

> [T]he government called Michael McMillian, LaChristopher Russell and Rantrese Smith who are all alleged accomplices and coconspirators named as codefendants in the indictment with Daniel Robert. The government has entered into plea agreements with McMillian, Russell and Smith. These agreements provide for certain benefit to those individuals, like dropping charges as to McMillian, Russell and Smith, and a recommendation for a reduced sentence as to Russell. Such plea bargaining, as it is called, has been approved as lawful and proper, and is expressly provided for in the rules of this court.

> An alleged accomplice or coconspirator, including one who has entered into a plea agreement with the government, is not prohibited from testifying. On the contrary, the testimony of such a witness may alone be of sufficient weight to sustain a guilty verdict. You should keep in mind, however, that such testimony is always to be received with caution and weighed with great care. You should never convict a defendant upon the unsupported testimony of an alleged accomplice or coconspirator unless you believe that testimony beyond a reasonable doubt.

8

> The fact that an alleged accomplice or coconspirator has entered a plea of guilty
> to the offense charged is not evidence of the guilt of any other person, including
> Defendant Daniel Robert.

Jan. 23, 2020 Tr. at 16–17.  These instructions track the Fifth Circuit Pattern Jury Instructions

(Criminal).  Nothing about the Court's handling of the co-conspirators' testimony justifies

acquittal or a new trial.

      C.     Renewed Arguments

Robert says "the Court erred in failing to grant the defendant's pre-trial dispositive and

non-dispositive motions," entitling him "to a judgment of acquittal notwithstanding the verdict."

Mot. [207] ¶ 2; *accord* Mot. [209] ¶ 3 ("[T]he Court erred in failing to grant the defendant's pre-

trial non-dispositive motions, and as a result, the defendant is entitled to a new trial.  The

defendant respectfully submits that the suppression motion should have been sustained and there

was no search warrant for the search of the truck.").  He similarly argues that "[t]he Court erred

in failing to grant the defendant's motion to dismiss the case at the close of the government's

case."  Mot. [207] ¶ 3.  Finally, he more specifically reasserts his double-jeopardy arguments, *see*

Mot. [172] ¶ 3; Mot. [183] ¶ 11, and issues related to the identity of unknown co-conspirators,

*see* Mot. [207] ¶ 25; Mot. [209] ¶¶ 29–31.

Robert presents no legal arguments on any of these assertions, much less new ones that

the Court has not already considered.  Having reviewed the transcripts, the Court is comfortable

with the rulings it placed in the record and rejects these reasserted arguments for those same

reasons.

In a similar vein, Robert contends that "every defense objection that was overruled and

every prosecution objection that was sustained and every instance of plain error combined to

deprive the defendant of a fair trial and caused him to be convicted notwithstanding the

insufficiency of the evidence."  Mot. [207] ¶ 3a; *accord* Mot. [209] ¶ 4.  "A party objecting to

evidentiary rulings must specifically identify the alleged erroneous ruling and the improperly

excluded evidence." *Moses.com Secs., Inc. v. Comprehensive Software Sys., Inc.*, 406 F.3d

1052, 1059 (8th Cir. 2005).  Absent argument or authority explaining why any particular ruling

was incorrect or substantially affected his rights, the Court cannot say Robert has demonstrated a

right to a new trial or a judgment of acquittal.

      D.      Jail-House Calls

Robert made several incriminating telephone calls during pretrial detention; the

authorities recorded them.  In general terms, Robert instructed the callers to tell others, including

McMillian and Russell, to change their statements and take full responsibility for the charges.

*See* Exs. G-18, G-19(a)–G-19(g).  He also told the callers to encourage potential witnesses to

evade the Government's efforts to serve their trial subpoenas.  *Id.*  The recorded calls led to

Robert's indictment, in a separate case, on two counts of witness tampering.  *See United States v.

Robert*, No. 3:19-CR-260-DPJ-LRA.

The Court allowed the Government to introduce the recordings into evidence and use

transcripts of their content.  Robert says that was error for a litany of reasons.  To begin, he

argues that

> [] The defendant would respectfully show that the Court's admission of the tapes
> of the defendant's phone calls from the jail was error.

> [] The defendant would respectfully show that the Court was in error in its
> determination that the tapes of the phone calls fairly raised a presumption of
> consciousness of guilt[].  The defendant would respectfully show that the tapes
> showed that the defendant was trying to legally defend himself against the charges
> against him.

Mot. [207] ¶¶ 14–15.

These arguments are addressed throughout the record of this case.  First, Robert tried to

suppress the calls with a motion in *limine* that generically sought to exclude "[a]ny prior and bad

acts by the defendant, whether proof be by charged or uncharged misconduct."  Mot. [170] ¶ 2B.

While the motion was vague, the Court construed it as invoking Federal Rule of Evidence 404(b)

and learned during oral argument that Robert was attempting to exclude the jail-house calls.

Dec. 12, 2019 Rough Tr. at 30.[4]  Rule 404(b)(1) states:  "Evidence of a crime, wrong, or other

act is not admissible to prove a person's character in order to show that on a particular occasion

the person acted in accordance with the character."

The Court rejected Robert's Rule 404(b)(1) argument from the bench, holding that "if

[Robert] allegedly tampered with alleged codefendants then that would be intrinsic."  *Id.* at 35.

Thus, Rule 404(b)(1) would not preclude admission.  *See United States v. Yi*, 460 F.3d 623, 632

(5th Cir. 2006) ("Rule 404(b), however, only applies to extrinsic evidence and does not prohibit

intrinsic evidence").

As for consciousness of guilt, the Court observed that "[t]he attempt to tamper with a

witness typically is considered a consciousness of guilt."  *Id.* at 34–35.  Although that ruling was

"off the cuff"—Robert first raised the issue during oral argument—it was nevertheless factually

and legally sound.  First, Robert's statements support the inference.  By way of examples only, in

a September 30, 2018 call, Robert appears to dictate the contents of an affidavit he wanted

Russell to sign taking full responsibility for the drugs seized in 2009.  *See* Ex. G-19(b).  In that

same call, he instructed the unidentified female on the line to tell a potential witness to "miss

them subpoenas."  *Id.* at 6.  In another call on July 22, 2019, Robert asks an unidentified female

to call McMillian and "make him say man you know-you-you know [Robert] ain't got nothing to

do with that man-[Russell] even say he ain't got nothing to do with that and I need him to say

---

[4] The Court has reviewed the rough transcript from that hearing which is consistent with the
Court's own recollection and notes.

that." Ex. G-19(f) at 4.  In a subsequent call, Robert instructed an unidentified male to let

McMillian know that, since he had finished serving his sentence, he did not need to testify and

the prosecution was "bluffing [him]."  Ex. G-19(g) at 1; *see also id.* at 4 ("They can't make him

do nothing regardless of what they telling him.  He ain't got to show up.").

These statements are like those in *United States v. Bright*, where the defendant asked a

witness "to change his testimony before trial."  630 F.2d 804, 821 (5th Cir. 1980).  The Fifth

Circuit found the statements admissible "to show a 'consciousness of guilt' on the part of" the

defendant.  *Id.*  Robert has never offered authority or a cogent argument to the contrary.

Moving away from the content, Robert next challenges the admission of the transcripts:

> [] The defendant further respectfully submits that the Court's submission of the
> transcript[s] to the jury for consideration was also error.  The defendant
> respectfully would show that it is human nature for the jurors to rely on the
> transcript[s] rather than the tape[s] because it is so much easier to read the
> transcript[s] than replay the tapes.  To the extent that the defendant's counsel
> failed to object to the transcript[s] going back with the jury, it is respectfully
> submitted that such is plain error.

Mot. [207] ¶ 15.

As a preliminary note, the Court asked Robert's counsel whether he had "any objection"

to the transcripts' accuracy; he didn't.  Jan. 21, 2020 Tr. at 139.  Even now, Robert fails to

identify a single mistake.  That leaves Robert arguing that the Court should not have allowed the

transcripts into evidence at all.  But the Fifth Circuit has repeatedly approved the practice.  *See,*

*e.g.*, *United States v. Chaney*, 299 F. App'x 447, 453 (5th Cir. 2008).  Indeed, there is a pattern

jury instruction governing their admission, which the Court gave the jury both before the

recordings were played and at the end of trial.  *See* Fifth Circuit Pattern Jury Instructions

(Criminal) § 1.48; *see also United States v. Turner*, 960 F.2d 461, 464 (5th Cir. 1992) (finding

district court does not err when giving an instruction "modeled closely after the Fifth Circuit's

Pattern Jury Instructions" that "is a correct statement of the law"). The Court did not err in allowing the jury to consider the transcripts.

Robert next says "the jury was confused by the admission of the tapes." Mot. [207] ¶ 16. Robert raised the confusion issue at the end of the first trial day when reasserting his pretrial motion *limine*. *See* Jan. 21, 2020 Tr. at 139–40. The next morning, the Court ruled as follows:

> [T]he parties asked me to read the transcripts that have been premarked as G-19(a) through (g). They are alleged to be transcripts of telephone calls between the defendant and others. The defendant did not object to the accuracy of the transcripts that he asked me to read, but does object to their admission into evidence, arguing that they are confusing. That would be a Rule 403 objection. Under that rule, evidence is admissible unless the risk of confusion . . . substantially outweighs the probative value of the evidence. In this case, the evidence does have probative value. As the Fifth Circuit held in *United States v. Bright*[,] 630 F.2d 804, evidence suggesting witness tampering reflects a consciousness of guilt and is admissible.
>
> . . . .
>
> In any event, each transcript contains something of probative value and collectively, when they are considered together, a reasonable jury could find that they show an effort to manipulate multiple witnesses to avoid trial testimony consistent with those witnesses' prior admissions. As for the risk of confusion, the confusion in this case is largely the result of the—I would describe it as scattershot way the primary speaker who is identified as the defendant, speaks during the calls. Assuming that that is the type of confusion that Rule 403 contemplates, it does not substantially outweigh the probative value because the alleged attempt to suppress the evidence is easy to discern.

Jan. 22, 2020 Tr. at 7–9. Robert has not offered a convincing argument that the Court's ruling was erroneous. His argument speaks to the weight of the evidence, not its admissibility.

Robert's post-trial motions now expand on his trial objection regarding jury confusion. First, he argues that the jury "misunderstood the purpose of the tape[s]." Mot. [207] ¶16; *accord* Mot. [209] ¶ 16. That argument is a non-starter. As an initial point, this is not the same confusion he argued at trial, and he never requested a jury instruction to clarify the purpose for which the Government offered the evidence. Moreover, the Court would not tell the jury, *sua*

*sponte*, how the evidence supposedly supported the Government's case. Regardless, the argument is pure speculation that ignores the jury's province to consider the properly admitted evidence. And there were several readily apparent—and proper—purposes for that evidence as the attorneys explained during their closing arguments. *See* Jan. 23, 2020 Tr. at 44 (Government's initial closing); 47–49 (Defendant's closing); 64–66 (Government's rebuttal).

Next, Robert offers more speculation about the ways the jury may have used this evidence, suggesting that it returned a verdict for a 2019 conspiracy that was never charged— i.e., that a variance occurred:

> [] The defendant respectfully submits that the jury probably considered the tapes as a statement of a "co-conspirator (Daniel Robert) in furtherance of the conspiracy." This is in effect a variance because the defendant is being charged for a conspiracy not set out in the indictment.
>
> . . . .
>
> [] The belief that a conspiracy was going on as a result of the phone calls was an erroneous belief because any conspiracy had long been terminated. The defendant would show that any alleged conspiracy was terminated by the arrests of the co-conspirators.
>
> . . . .
>
> [] The tapes were also confusing and prejudicial in that the jury could have erroneously believed that some or all of the persons on the other end of the phone conversations by Daniel Robert were one or more of the alleged co-conspirators, LaChristoper Russell, Michael McMillian, or Rantrese Smith. This would have exacerbated the prejudice resulting from the jury's likely erroneous belief that the phone calls were evidence of statements by Daniel Robert in furtherance of a conspiracy.

Mot. [207] ¶¶ 17–20 (citation omitted).

As an initial point, Robert alludes to Federal Rule of Evidence 801(d)(2)(E), which exempts from the definition of inadmissible hearsay a statement "offered against an opposing party" that "was made by the party's coconspirator during and in furtherance of the conspiracy."

That rule has no application to Robert's own recorded statements and was never argued with respect to the tapes.

He is also mistaken that the tapes produced a variance. The Court clearly instructed the jury as to the dates of the charged conspiracies:

> Starting with Count 1, the defendant is charged with conspiring to possess . . . with intent to distribute more than 500 grams of cocaine hydrochloride on or about February 22, 2007, and continuing through on or about March 23, 2007.
>
> . . . .
>
> As to Count 3, the defendant is charged with conspiring to possess with intent to distribute more than five kilograms of cocaine hydrochloride on or about June 26, 2009, and continuing through on or about August 5, 2009.

Jan. 23, 2020 Tr. at 21–22. And it further instructed: "You are here to decide whether the government has proved beyond a reasonable doubt that the defendant is guilty of the crimes charged in the indictment. *The defendant is not on trial for any act, conduct, or offense not alleged in the indictment." Id.* at 19 (emphasis added). "[J]urors are presumed to follow the instructions given to them by the court." *United States v. Owens*, 683 F.3d 93, 104 (5th Cir. 2012). There was no variance, and the jury was properly instructed as to the temporal duration of the alleged conspiracies.

Robert also disputes the way the Government used this evidence:

> [] The tape[s] and transcript[s] w[ere] used by the prosecutor in her argument that Daniel Robert was the head of the conspiracy. She selected a portion of the tape to emphasize her contention that Daniel Robert was the head of the conspiracy. In that part of the tape, Daniel Robert was forcefully requesting certain types of help from the person on the other end of the conversation. The prosecutor used Robert's forcefulness in arguing that Daniel Robert was in charge of the conspiracy. Assuming that the jury did accept the tape as evidence that Daniel Robert was in the process of making statements in furtherance of a conspiracy at the time of the phone call, then the jury might consider that this tape eliminated the need for them to find corroboration.

Mot. [207] ¶ 19.

AUSA Chalk did use the tapes during closing; there was nothing improper and there were no objections. First, the tapes create a reasonable inference that Robert controlled—or was attempting to control—other participants as late as 2019. That evidence speaks to his relationships with McMillian and Russell and his role in 2007 and 2009. It also corroborates their testimony that Robert called the shots. Regardless, as previously discussed, the Government was not required to corroborate their testimony. *Valdez*, 453 F.3d at 257.

Finally, as to the recordings, Robert claims that the Court erroneously sustained the following objection during his closing argument:

> MR. GATES: . . . And the Court instructed you that the tape recording itself is the evidence, not the transcripts. The transcription is -- the purpose of the transcription is to help you understand the tape. But, you know, the tapes have -- it appears to me that the tapes have been edited to some extent. You know, I think the government will tell you that the purpose is something other than to make it difficult to --

> MS. CHALK: Objection, Your Honor. The transcripts have been edited outside of this courtroom and it would be an improper statement.

> THE COURT: Sustained. For the record, we discussed what would be edited and how it would be handled with the jury.

> MR. GATES: All right.

Jan. 23, 2020 Tr. at 47–49. According to Robert,

> [t]he arguments that the tapes were edited was a fair argument. The agreement by the defense counsel that the tapes could be submitted to the jury with some redactions was not a waiver of the argument about editing, and to the extent that it was, it was plain error. Just listening to the tapes raises the fair inference to the jury that the tapes had been edited to some extent, and it was error to prohibit comment on the possibility of editing.

Mot. [207] ¶ 22.

As Robert correctly notes, the tapes were edited, and for good reason—they included statements the Court excluded when granting *his* pretrial motion in *limine*. All of this was

16

discussed before the recordings were played for the jury.  On the morning trial began, the

Government made the following announcement outside the jury's presence:

> We intend to introduce jail calls that have been subject to prior motions in this
> case.  And those jail calls have been received from the jail and provided to the
> FBI, and transcripts have been completed and prepared for the purpose of trial.
> However, those jail calls have been edited to take out certain statements made by
> the defendant, or conversations made by the defendant as to his prior time in
> incarceration, and other issues, including charges out of Chicago or in Illinois that
> the Court ruled we were prohibited to bring into evidence.

Jan. 21, 2020 Tr. at 9.  The prosecutor further explained that, because of the editing process,

"there will be some pauses in a phone call that the jury will hear," but the redactions were not

noted in the transcripts, and the original and edited transcripts had been provided to defense

counsel.  *Id.* at 9–10.

The Court asked defense counsel, "I assume you don't want them to play the whole

tape[s] because it would violate the order on your motion in *limine*," to which he responded,

"That's correct."  *Id.* at 10.  Defense counsel went on to raise an additional objection:  "I object

to the tapes being admitted because I think that they are confusing and hard to follow and there's

lots of gaps in there and it is not clear what is being talked about.  So I agree with what she's

saying about editing out prior time and other charges."  *Id.*  The Court seemingly resolved the

issue:

> I've got to give instructions to the jury about how to use the transcripts.  And, you
> know . . . if there is a disagreement about the transcription itself, [the defendant]
> can produce [his] own version of it, and the jury can choose between the two.  If
> you're on board with the transcription itself, then that's not an issue.  But when I
> give that instruction, I could also state something along the lines of, "You'll
> notice that there are, you know some gaps in the --
>
> MRS. CHALK:  Pauses.
>
> THE COURT:  "-- pauses, and not everything that was said on this recording
> would be admissible evidence at trial.  So don't worry about what may have
> happened during the pauses."  Something along those lines.

*Id.* at 10–11.  Defense counsel acquiesced:  "If you're going to allow the transcript, I think that would be an appropriate instruction."  *Id.* at 11.  Robert's suggestion in closing argument that the tapes were edited in a nefarious way was objectionable; no error occurred.

  E. Hubbard Evidence

  The next arguments concern confidential informant Hubbard.  Former Jackson Police Department officer Cloy testified that task-force agents recorded telephone calls between Robert and Hubbard that helped develop Robert as a target.  Jan. 22, 2020 Tr. at 11.  Those calls were not in evidence.  Cloy's testimony regarding Hubbard generated over a dozen arguments in Robert's two post-trial motions, all of which were offered in short statements without analysis or—in most instances—legal authority.  This Order organizes the issues into the following four groups:  (1) whether there was evidence that Robert and Hubbard spoke on the phone; (2) Robert's hearsay objection; (3) the Government's closing argument; and (4) the Court's response to a jury note regarding the Robert/Hubbard calls.

  1. Whether Calls Occurred

  Robert frequently asserts that there was no evidence of a telephone call between himself and Hubbard.  For example, he argues:  "According to the undersigned's best memory, there was no testimony about a conversation between Daniel Robert and Deadrian Hubbard.  [T]he jury note shows that at least some of the jury believed that there was some testimony about a conversation between Daniel Robert and Deadrian Hubbard."  Mot. [207] ¶¶ 8–9.  He then links that asserted fact to various arguments, like his contention that "[i]t is also reasonable for [the jury] to believe that the fact of the non-existent conversation was sufficient corroboration of the alleged co-conspirators' testimony about the alleged conspiracy."  Mot. [207] ¶ 10a; *see also id.* ¶¶ 10b, 11, 12, 13; Mot. [209] ¶¶ 4a, 6–10, 12.

These arguments are all factually and legally unsupported.  First, as noted above, Cloy testified, without objection, that he "did monitor phone calls between Mr. Hubbard and Daniel Robert."  Jan. 22, 2020 Tr. at 19.  Second, the co-conspirators' testimony was corroborated as discussed above.  Finally, a "defendant may be convicted on the uncorroborated testimony of a coconspirator who has accepted a plea bargain unless the coconspirator's testimony is incredible."  *Valdez*, 453 F.3d at 257.

      2.      Hearsay

Robert next says "testimony about the FBI's reason for pursuing [Robert] should have been excluded as improper hearsay."  Mot. [209] ¶ 33.  Robert does not identify a specific objection that was overruled, making it difficult to evaluate his argument.  That said, Cloy mentioned this subject several times during his testimony, but only in the following exchange did the Court fail to fully sustain a defense objection:

> THE WITNESS:  In mid-to-late 2006, we were able to develop a confidential human source that advised us that Mr. Robert --
>
> MR. GATES:  I object to hearsay.
>
> THE COURT:  All right.  Ladies and gentlemen, you remember yesterday I said there are times where you could consider evidence for limited purposes, and that I would come back and explain that if it happens.  All right.  So that's where we are right now.  The question was how this investigation began.  And so, the evidence is being admitted for that purpose.  It is not being admitted for the truth of whatever this confidential informant may have said.  In other words, I see one nod and blank stares.  I'm going to make a hypothetical.  Let's say that the confidential informant said, "Hey, you need to know that this guy is selling drugs."  That is not evidence that the person is actually selling drugs.  It is only evidence of why the investigation began.  Does that make sense?
>
> Okay.  All right.  You may proceed.
>
> MR. KIRKHAM:  Thank you, Your Honor.
>
> BY MR. KIRKHAM:

Q.  So you were saying that the confidential human source gave you information that Daniel Robert was involved in narcotics trafficking.  Is that correct?

A.  Yes, sir.

Jan. 22, 2020 Tr. at 11–12.

As the Court's limiting instruction stated, the evidence was not offered for the truth of the matters Hubbard asserted.  *Id.*  And the Court sustained other hearsay objections, striking the evidence from the record.  *Id.* at 19.  The Court also instructed the jury in the final instructions to disregard "evidence which ha[d] been stricken."  Jan. 23, 2020 Tr. at 13.

Finally, to the extent Robert now challenges testimony for which he offered no contemporaneous objection—and that he has not specifically identified in his motions—there was no plain error affecting his substantial rights.  The fact that the calls occurred is not hearsay, the content of those calls was never offered for their truth, and the evidence of guilt was overwhelming.  McMillian and Russell both testified that Robert was trafficking drugs, and other evidence supported their testimony.

3.      The Government's Closing Arguments

The telephone calls between Robert and Hubbard came up again during the Government's closing argument in two ways.  The first occurred when AUSA Kirkham stated:

[T]he defendant knew or reasonably should have known that the scope of the [2007] conspiracy involved more than 500 grams of cocaine hydrochloride . . . . [D]efendant directed LaChristopher Russell to give Hubbard that kilogram of cocaine.  There were monitored phone calls that the FBI agent, Juan Cloy, testified about.  And you heard the testimony of LaChristopher Russell.

Jan. 23, 2020 Tr. at 34–35.  Robert did not object, but the Court interrupted the argument shortly thereafter for a bench conference:

THE COURT:  All right.  There was no objection, but I think there was something said that was improper and I don't want to deal with it post-trial or in a 2255.  When Mr. Kirkham said that certain agreements were confirmed by the FBI, what the FBI heard on the calls, those calls were never put into evidence.

20

And anything the FBI -- any testimony about what the FBI may have heard in the telephone calls was not offered and you just argued it as though it was.

MR. GATES:  Okay.

THE COURT:  All right.  And so, before we get too far away from that, I think that on appeal, somebody is going to ask whether I quickly made -- corrected the record.  So I am going to correct it now, and I want to discuss with all of you how best to do that.  Give me a moment.

I would like to say it something like this:  Mr. Kirkham argued that certain information was confirmed by what the FBI heard on calls.  To be clear, these calls are not in evidence, and any testimony about them was offered just so you would know why the FBI was on notice and did what it did.  They are not evidence of anything else or what was actually discussed on those calls.  Does that fix it?

MS. CHALK:  I think it does, Your Honor.

MR. GATES:  Yes.

*Id.* at 36–37.  The Court then gave that instruction, and the Government's closing continued.

Though Robert saw no need to offer a contemporaneous objection during the Government's closing, he now takes issue.  According to him,

the prosecutor's argument that the FBI confirmed Daniel Robert's participation in an alleged conspiracy with LaChristopher Russell and Michael McMillian was not cured by the Court's instruction.  The Court sustained its own objection to this argument; however, the jury was probably influenced by this argument in its search for corroboration of the testimony of the alleged co-conspirators.

Mot. [207] ¶ 13; *see also* Mot. [209] ¶ 13.

The Court agrees that the Government's argument could mislead—which is why the Court stopped it *sua sponte*.  Robert then consented to the Court's contemporaneously issued instruction, which fixed the problem.  *See Owens*, 683 F.3d at 104 ("[J]urors are presumed to follow the instructions given to them by the court.").  The Court also instructed the jury in its final instructions that "statements [and] arguments made by the lawyers are not evidence . . . .

What the lawyers say is not binding upon you." Jan. 23, 2020 Tr. at 13.  So to the extent there was an issue with the Government's argument, the Court adequately addressed it.

The second disputed reference to the Hubbard calls appeared in one of the Government's PowerPoint slides.  When AUSA Kirkham reached that slide, he quickly advanced past it.  *See id.* at 73, 79–80.  Robert now says,

> with due respect to the prosecutors who were in the heat of battle, that the slide presentation about a phone call and about FBI confirmation probably aggravated the problem with respect to phone calls, even though a slide emphasizing the phone call might have only been momentarily displayed.  The Court saw it.  There is no reason to believe that the jury did not see it.

Mot. [207] ¶ 12; *see also* Mot. [209] ¶ 12.

To begin, this argument, like others, is premised on the mistaken belief that there was no evidence of calls between Robert and Hubbard.  Regardless, the skipped slide does not affect Robert's substantial rights.  Robert's counsel apparently never saw the slide because he offered no objection—contemporaneous or otherwise.  Instead, the Court raised the issue after the closing argument to make sure the record clearly indicated that the slide was not displayed for the jury to read:

> THE COURT:  I feel like after the issue came up in closing with respect to the FBI relying on the content of those calls that you actually skipped one of the pages on your PowerPoint.  It looked to me like you had another page that maybe was about to make a similar point and you skipped that page.  Am I correct about that?
>
> MR. KIRKHAM: I don't remember specifically.  I did remember seeing something that I thought might get into that area and so I went -- I tried to go past it and not make any reference to it.
>
> THE COURT: Right.  That's my recollection as well.  And my concern is that, you know, on appeal somebody can look at this and quote that page from your PowerPoint as having been presented to the jury, when, in fact, it wasn't.  I think you only skipped one page, to my recollection, and it is the first time that the words "FBI" popped up after I gave the jury the instruction that I gave them. That's my recollection.

22

Jan. 23, 2020 Tr. at 73.  AUSA Kirkham later confirmed that the slide he "flashed past very

quickly" was slide 15, which "does not mention the FBI, but it mentions phone calls."  *Id.* at 79.

Robert has not shown that the skipped slide entitles him to a judgment of acquittal or new trial.

        4.     The Jury Note

The Hubbard evidence produced the following inquiry from the jury:  "The jury has a

question regarding evidence.  Why were the phone calls between Deadrian Hubbard and Daniel

Robert not admitted into evidence for the 2007 incidents, Count 1 and Count 2?"  *Id.* at 72.  After

discussing the note with the parties, the Court sent the following response:  "You have received

all of the evidence in this case and must base your verdict on that evidence.  Also, your verdict

must be based on all of the instructions, and you may not single out any one instruction,

including this one."  *Id.*  Neither side objected to that response.

Robert now has several objections.  For starters, he complains that "[t]he Court did not

tell the jury that no such evidence existed.  The Court should have told the jury that no such

evidence existed."  Mot. [207] *Id.* ¶ 10(b).  While that argument is factually incorrect—there was

such evidence—he offers another, more detailed, argument:

> The first jury note sought information about an alleged conversation between
> Daniel Robert and Deadrian Hubbard.  This indicates that the jury was looking for
> corroboration of the testimony of the alleged co-conspirators.  When, after receipt
> of the first note from the jury, the Court instructed the jurors that they had
> received the evidence, the jury then knew that there was no more to say about
> Deadrian Hubbard.  Thus, the jury was in effect instructed that anything else
> about Deadrian Hubbard was not necessary to a conviction and that the search for
> corroboration of the testimony of the co-conspirators was unimportant.

Mot. [209] ¶ 6.

Here again, Robert never offered a contemporaneous objection to the Court's response,

and the response was not plain error.  In addition, Robert's argument offers some hefty

speculation as to how the jury reacted to the Court's response while ignoring the Court's charge

not to "single out any one instruction, including this one." Jan. 23, 2020 Tr. at 72. The other instructions the Court referenced in its response included the following: "[Y]ou must consider all of the evidence." *Id.* at 14. Regardless, like so many other arguments in his two motions, Robert premises it on the mistaken belief that a co-conspirator's testimony must be corroborated, despite the Court's thorough—and correct—instruction about co-conspirator testimony.

In sum, none of Robert's arguments regarding Cloy's testimony about Hubbard and his telephone calls justifies a new trial or a judgment of acquittal.

F.      *Allen* Charge

Robert takes issue with the Court giving the jury an *Allen* charge, arguing that it "probably permitted the juror with the erroneous view [of the evidence regarding phone calls between Robert and Hubbard] to prevail over the juror or jurors with the correct understanding." Mot. [207] ¶ 11; *see also* Mot. [209] ¶ 25 ("The defendant respectfully asserts that he was denied a fair trial by the Court's giving an *Allen* charge after the jury announced that they could not reach a decision on the 2007 charges. The jury had been out for a while and it was approaching the end of the day. Shortly after the *Allen* charge was given, the juror or jurors holding out for conviction relented.").

On January 23, 2020, the jury went out to begin deliberations at roughly 12:05 p.m. Jan. 23, 2020 Tr. at 75. At 4:17 that afternoon, the Court and parties gathered to consider a second note from the jury. It stated: "The jury is hung on Counts 1 and 2. The verdict has been reached on Counts 3 and 4." *Id.* The Government requested an *Allen* charge, whereas Robert's attorney asserted "that the hung jury on Counts 1 and 2 should be allowed to stand." *Id.* at 76. The Court noted that whether to give an *Allen* charge is "within the sound discretion of the trial court," and

24

proceeded to give the pattern jury instruction.  *Id.* at 76–79.  The jury returned a verdict less than an hour later, with Court adjourning at 5:15 that evening.  *Id.* at 83.

Robert never explains how the *Allen* charge gave hypothetical jurors with "erroneous views," Mot. [207] ¶ 11, leverage over other right-thinking jurors.  And indeed, his own views about co-conspirator corroboration were erroneous.

Nor does Robert cite any authority to support his argument that granting an *Allen* charge around 4:15 pm—after only four hours of deliberations—was an abuse of discretion.  When assessing the propriety of an *Allen* charge, courts consider whether the circumstances render the charge "coercive."  *United States v. Montalvo*, 495 F. App'x 391, 393 (5th Cir. 2012).  Robert appears to suggest that the timing demonstrates coerciveness, but "[i]n *United States v. Betancourt*, [427 F.2d 851, 854 (5th Cir. 1970), the Fifth Circuit] rejected a challenge to an *Allen* charge under circumstances in which the jury rendered a verdict at 10:30 PM on a stormy night and a mere two hours after the *Allen* charge was issued."  *Montalvo*, 495 F. App'x at 393–94 (footnote omitted).

In the present case, the Court gave the *Allen* instruction a little after 4:00 pm.  And though the jury came back relatively quickly, the Court was conscious of the need to avoid coercion and therefore stated:  "I have an instruction that I am going to read to you.  We're not going to deliberate forever or go deep into the night, but I am going to ask that you continue your deliberations in an effort to agree upon a verdict and dispose of this case."  Jan. 23, 2020 Tr. 77.  The timing of the charge in this case renders it no more coercive than the charge in *Betancourt*.  The Court's issuance of an *Allen* charge does not require a new trial or a judgment of acquittal on Counts 1 and 2.

IV.     Conclusion

The Court has considered all arguments.  Those not addressed would not have changed the outcome.  To obtain a new trial, Robert had to show an error or errors that affected the outcome of the proceedings.  Even if one or more of his present arguments had merit, the Court cannot say they affected the outcome because the evidence of Robert's guilt was overwhelming. For the foregoing reasons, Robert's Motion for Judgment of Acquittal Notwithstanding the Verdict [207] and his Motion for New Trial [209] are denied.

**SO ORDERED AND ADJUDGED** this the 22nd day of April, 2020.

s/ *Daniel P. Jordan III*
CHIEF UNITED STATES DISTRICT JUDGE